(153 App. Div. 1.)

### FINNEY v. NATIONAL FIREPROOFING CO.

(Supreme Court, Appellate Division, First Department. November 8, 1912.)

1. MASTER AND SERVANT (§§ 107, 121, 154[*])—INJURY TO SERVANT—NEGLIGENCE.

An employé of a subcontractor to construct the concrete work in a building walked into an open shaft while on a completed concrete floor, and while engaged in gathering up coils of reinforcing wire remaining on the floor. The accident happened after dusk. The subcontractor had furnished movable lights, which the employé could have used to enable him to discover the shaft. As the work of concreting was completed on each floor, the general contractor generally constructed guards around the shaft; but guards had not been constructed at the time of the acci-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

dent, though the floor had been finished about 24 hours before. The employé knew of the open shaft, though he might not have observed that guard rails had not been erected. *Held*, that the subcontractor was not liable, either on the ground that he failed to furnish the employé a safe place, or on the ground that it was his duty to guard the shaft, or furnish more light or warn the employé of the existence of the shaft.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199-202, 212, 228-231, 254, 255, 308, 309; Dec. Dig. §§ 107, 121, 154.*]

2. MASTER AND SERVANT (§ 217*)—INJURY TO SERVANT—ASSUMPTION OF RISK.
The employé assumed the risk of injury as a matter of law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574-600; Dec. Dig. § 217.*]

3. MASTER AND SERVANT (§ 150*)—INJURY TO SERVANT—OBLIGATION OF MASTER.
An employer, furnishing sufficient lamps for his employés working while dark, owes no duty to place the lamps in their hands, or to tell them when to use them for their own safety.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 297, 299-302, 305-307; Dec. Dig. § 150.*]

4. APPEAL AND ERROR (§ 1178*)—DISPOSITION OF CASE ON APPEAL—NEW TRIAL.
Where the record on appeal from a judgment awarding damages for negligent death does not contain plaintiff's exceptions, the Appellate Division must order a new trial, though the evidence in the record is insufficient to take the case to the jury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4604-4620; Dec. Dig. § 1178.*]

Appeal from Trial Term, New York County.

Action by Esther Finney, as administratrix of Frederick L. Finney, deceased, against the National Fireproofing Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Edwin A. Jones, of New York City (H. E. Linesweaver, on the brief), for appellant.

Alfred S. Brown, of New York City, for respondent.

LAUGHLIN, J. This is a statutory action to recover for the death of Frederick L. Finney, alleged to have been caused by the negligence of the defendant, in whose employ he was. The Seaboard Realty Company was engaged in the construction of a building at the northeast corner of Eighteenth street and Fourth avenue, in the borough of Manhattan, New York, pursuant to a contract with the owner of the premises. It sublet various parts of the work. The concrete work was let to the defendant. The electric wiring, the stone work, the masonry work, the iron work, the construction of elevators, and the plumbing work were likewise separately let to other contractors. The defendant's contract embraced only the work of constructing fireproof cement floors.

In the execution of this work, the defendant's employés were divided into three gangs, each in charge of a subforeman, acting under

the direction of a common foreman, and they were known as the carpenter gang, the concreting gang, and the laborers. The decedent and about 11 others constituted the laboring gang. The carpenters constructed a framework and wooden flooring under each floor, and the material therefor was brought to them by the carpenters' assistants, or laborers. On this flooring the decedent's gang brought and placed steel plates, which they oiled, and on these plates the concreting gang spread about an inch of concrete, and thereupon reinforcing wire, of the width of about six feet, was inserted, resting on the cement and the flanges of the girders, and extending lengthwise between the girders, and on this about four inches more of cement was spread. This work was done in order from the first floor up. It was also the duty of the decedent's gang, after the cement had set, to remove the lumber and steel plates, and also any material left by the concreting gang, to the floor above.

The decedent met with the accident which resulted in his death shortly after 6 o'clock on the afternoon of the 28th day of January, 1910. He, with other members of his gang, had been working that day on the sixth floor. The concreting of the fifth floor had been finished about 24 hours before; but about three coils of reinforcing wire remained on the fifth floor, and shortly before 6 o'clock he and three or four fellow workmen were ordered, by the assistant foreman in charge of their gang, to go to the floor below and load the coils of wire onto the hod-hoisting elevator for the purpose of removing them to the sixth floor. The sides of the building were not inclosed at this time, nor had any partitions been constructed. The floors were about 100 by 200 feet in dimensions. The elevator was about in the center of the building. The wire was in the vicinity of the elevator shaft; the farthest being about 20 feet therefrom. The evening was stormy and dark. The assistant carpenters, or laborers, were working overtime, as they frequently did, on account of the fact that during the ordinary hours of labor the elevator was in other use. The defendant had furnished 12 oil or gasoline banjo lamps, or torches, which were kept in a toolhouse on the ground floor, in charge of a boy, and had on hand in the toolhouse a large quantity of oil or gasoline for filling the lamps. This was the only method provided for lighting the building. When any of the employés required a lamp, they applied to the foreman, who gave them an order for it. On the occasion in question, the men had been working on the sixth floor with four of these lamps. Without any special direction, the decedent and a fellow workman each took one of these lamps from the sixth floor down to the fifth floor, and suspended them from the framework of the elevator, with a view to lighting the vicinity where they were to work. There is testimony to the effect that one of these lights went out, but whether it burned out, or was blown out, does not appear; and there is other testimony to the effect that both were burning at the time of the accident.

The general foreman was absent from the building at the time. The assistant foreman did not accompany the men to the fifth floor, or give any further directions with respect to the work, or the method

of doing it, and at the time of the accident he was on the ground floor. The decedent had been on this work at least three weeks, and he and his fellow workmen apparently were accustomed to performing such services without the immediate presence of a boss. They rolled up two coils of the wire, and placed them on the elevator, and they were conveyed to the sixth floor, where some three or four of the decedent's gang remained to receive them. On rolling up the third coil, they found that it was not conveniently placed to enable them to put it on the elevator. The coils of wire weigh from 300 to 400 pounds, and are bulky and inconvenient to handle. It had been the custom of the men, in such circumstances, to obtain a 2x4 scantling, and roll the wire onto it, and in that way they could conveniently turn the coil of wire about, as required. On seeing that the coil of wire was not conveniently located for loading it upon the elevator, the decedent volunteered to find a scantling, and on announcing his purpose he started to look about on that floor. Another member of the gang did likewise.

At this time, the entire floor, with the exception of the elevator shafts and the pipe shaft, and probably the stairway openings, had been cemented. An open shaft was left, in which to run upright pipes from the bottom to the top of the building, to supply the different floors with water, and to carry away waste water, and for electrical construction, and other similar purposes. The testimony with respect to the dimensions of this shaft is conflicting. The width is given as from 2½ to 3 feet, and the length from 2½ to 6 feet; but one witness apparently had the plans which required this opening before him while testifying, and his testimony indicated that it was about 2½ feet square. The plumbers had erected three pipes in this opening to a point above the sixth floor. One of them was 4 inches in diameter, and the other two 3 inches each, and they were galvanized. The pipe shaft was about 15 feet from the elevator shaft, and these pipes were in that part of it nearest to the elevator.

There is a conflict in the testimony with respect to the extent to which the floor was illuminated by the lamps. The testimony is to the effect that the floor was well lighted, for a radius of from 7 to 15 or 20 feet from the lamps. The decedent evidently walked toward the pipe shaft, with his back toward the lights, and, while witnesses say that the galvanized pipes could have been seen, no one testifies that, approaching the shaft in that manner, the opening was observable. He walked into the shaft, and was precipitated to the ground, and instantly killed.

The plaintiff sought to establish a cause of action, both at common law and under the Employer's Liability Act; but the court dismissed the complaint, in so far as it was based on the Employer's Liability Act, and submitted the case to the jury on the theory of liability at common law, in failing to furnish the decedent with a safe place in which to perform his duties. The learned counsel for the respondent argues, in support of the recovery, that the defendant failed in its duty to furnish the decedent a safe place, and that it was its duty to guard this opening, and to furnish more light, and to warn the decedent of the existence of the opening.

[1] We are of opinion that the defendant was not liable on any of the theories suggested, and that the decedent assumed the risk of sustaining injury in this manner. These lights, as already appears, were movable. While the decedent and his colaborer were looking for a scantling, the other men on the floor with him were doing nothing. They were waiting until the scantling was produced. In venturing into the dark, he was at liberty to take one of these lights, for there were two on that floor, or to call for another light from the floor above, or to ask for another lamp from the toolhouse. We are of opinion that the rule of safe place is not applicable here. Whallon v. Sprague El. Co., 1 App. Div. 264, 37 N. Y. Supp. 174; McHugh v. Grand Central B. & C. Co., 133 App. Div. 100, 117 N. Y. Supp. 714; Beique v. Hosmer, 169 Mass. 541, 48 N. E. 338. It was no part of the defendant's contract to guard this opening. The duty of guarding the opening, if any, rested on the general contractor. It appears that, as the work of concreting was completed on each floor, the general contractor constructed guards around the pipe shaft on each floor up to the fourth floor, and at that point the carpenters in the employ of the defendant prevented the further construction of guards by the men employed by the general contractor upon the ground that, while those men were union laborers, they were not union carpenters, and that this was carpenters' work. This occurred a day or two before the accident, and nothing further was done with respect to erecting guards on the fourth or fifth floors until after the accident, although the general contractor had carpenters in his employ on the work.

[2] The decedent must have known that this open shaft was left; for, in the work that he was doing on each floor in assisting the carpenters, the fact that this space was not concreted, and that these pipes ran up through it, was open and obvious. It may be that he had not observed that guard rails had not been erected around the opening; but it would seem that he had the same opportunity to observe this that the defendant had. His duties consisted in assisting in the construction of the floors of the building. The work was necessarily dangerous, for in the main it was performed where he was obliged to walk about on girders and temporary ways. While the work of constructing a floor was in progress, there was no occasion for the defendant to guard the pipe shaft, for it was no more dangerous than the other openings between the girders and beams, which were being filled up by the concrete flooring; and after that work was completed on a particular floor, when nothing remained for the defendant's employés to do but to remove the material left unused, it would be unreasonable to require it to erect barriers around these openings, work not embraced in its contract, lest its employés, who it had a right to assume knew of the openings, in removing the material, might meet with an accident therefrom. In moving about this floor in the dark, even if there had been no opening in it, there was danger of an accident from stumbling over loose material, or running into pillars, or stairways, or this opening, and the decedent in so doing assumed the risk (Kennedy v. Manhattan

Ry. Co., 145 N. Y. 288, 39 N. E. 956; Sharpsteen v. Livonia S. & M. Co., 3 App. Div. 144, 38 N. Y. Supp. 49), and we are of opinion that the defendant was not, in the circumstances, obliged to foresee that the decedent would do this and to warn him of the danger.

[3] If the decedent had used a lamp, in all probability the accident would not have happened. The master, having furnished sufficient lamps, owed no duty to its employés to place them in their hands, or to tell them when to use them for their own safety. Madigan v. Ocean St. Nav. Co., 178 N. Y. 242, 70 N. E. 785, 102 Am. St. Rep. 495.

[4] The evidence in this record, as we view it on the law applicable to the case, was insufficient to take the case to the jury; but, since the record does not show that it contains the respondent's exceptions, we are of opinion that a new trial should be ordered. See Bonnette, as Ex'r, v. Molloy, 138 N. Y. Supp. 67, decided herewith.

It follows, therefore, that the judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.